So we will begin with the day calendar with Purundini v. J.P. Morgan. Good morning. May it please the court. My name is Andrew McNeela and I'm the attorney for the plaintiff appellant. The district court's dismissal order respectfully should be reversed because the court misapplied the Gartenberg factors and demanded a level of detail that is not required at the pleading phase in section 36B claims. Turning first to the comparative fee structures factor, the plaintiff identified three separate benchmarks, each of which was independently sufficient to establish that the fund's fee was substantially higher than the fee charged to comparable funds. In fact, the district court found that two of the three benchmarks, which were other funds advised by the defendant, were in fact apt comparisons. Nonetheless, the district court rejected plaintiff's allegations because they purportedly did not suggest that defendant's fee necessarily, and I'm quoting, necessarily was outside the range of arm's length bargaining. But at the pleading phase, plaintiff's allegations need not show that defendant's advisory fees were necessarily excessive. They need only raise a plausible inference that they were excessive. And here, plaintiff alleged that the defendant charged the fund a fee that was substantially higher, and in one case, roughly double the fee it charged two of its other clients for similar advisory services. Did you affirmatively claim that this fund is in the top quintile of the Lipper Index? I believe the complaint mentioned that it was in the top quintile, which actually means that the fees according to the benchmark the defendant's proffer is in the bottom 20 percent, which means like the lowest 20 percent of fees charged. It's what you want. That's what, according to their benchmark, right? The benchmarks The Lipper benchmark, it is what it is. Well, that's correct. It's a If it's in the top, if it's in the first quintile, then it means it's, it's the best value for money relative to others, correct? According to the specific benchmark that's being proffered. What Your Honor, I think is driving at us, you have two competing benchmarks that are at issue here in this case, right? We provided three bases for showing that the fee was high compared to other funds that the defendants themselves advise. Defendants come back and say, no, no, no, don't look at those. Look at the company that we specifically hired to pick a particular group of comparators and focus on that one. Now that is a factual dispute. That can't be resolved at the motion to dismiss phase. And in fact, we cite numerous courts that have said you can't pick and choose between benchmarks under this court's precedent. Isn't it in the complaint that you're in the top as opposed to the bottom quintile? Is that not in the complaint? Your Honor, what's in the complaint is a summary of what the Lipper report reported. We're not claiming that that is an accurate representation of the fees as it compares to what we believe are more accurate benchmarks, right? So it's the difference between quoting what someone said versus asserting that that is in fact the case. What we allege in our complaint at length is that there are three benchmarks against which to judge the fees here. And in fact, one of those benchmarks is the only benchmark that's actually arm's length. That would be the PSF subadvice fund, right? And I think it's good to take a step back and remember the Supreme Court's admonition that comparing yourself to other mutual funds when you're doing this sort of analysis is not the best bet to assess whether fees are excessive. Because the whole point of the ICA and the need for this analysis is that there are structural conflicts which render competitive forces not as robust in the mutual fund industry as they are in other segments of the economy. So you look . . . But if you don't proceed by comparator, how can you proceed? Well, we're proceeding by three. So you go and you buy sardines. I mean, you have to compare it with other sardines. You can't compare it with bananas. Well, absolutely. And that's why we're saying in this case, there are three sardines we're comparing it to. They are saying don't pay attention to their sardine. Focus on the one that . . . Which are the three? The three are two funds that the defendants themselves provided advisory services to. That's the PSF sub-advised fund. That's the JP equity fund. And then there's an index of other Bloomberg funds which are similarly categorized by Bloomberg, by asset class, equity type, strategy, objective, those sorts of things. Now, what I wanted to get back to was, touching upon the point I raised that the Supreme Court recognized, they said looking at other mutual funds is not necessarily the best gauge. Because if there are structural conflicts, you can't tell whether those are arm's length deals. There's only one benchmark here that's arm's length. That was the PSF sub-advised fund. That was where you have another fund that was shopping around for a sub-advisor. And the fee that they charged for identical advisory services was just contractually, on the face of the contracts, 20 basis points less. The same exact advisory fees. And the only basis, the only reason why that's the case is because one was an entity that was free to go around and shop around for the best price versus the fund here, which was a captive entity. Now, as the complaint makes clear, though . . . You say captive. I mean, it is an independent board. I mean, who has captured it? Well, by definition, they're captive entities. That's why the ICA exists and requires them to have certain . . . That may be a term of art, but surely it matters that the board is independent. That's one of the factors that is considered. By statute, they're in regulation. Definition of independent. Independent directors, they're not affiliated with the advising entity. But the way these . . . Does it mean, for example, are they independent if they're friends of Jamie Dimone? You know, I think that they're allowed to be friends. We don't make the argument that if they're . . . I'm not saying they're not allowed. I'm just saying the definition is not necessarily that comforting. No, it's not that comforting. And I would say, though, that that's just a preliminary matter. I mean, to even get to these Gartenberg factors to assess the fees, first and foremost, the board has to be independent. If it's not independent, there's a statutory violation in and of itself. But with respect to the PSF sub-advice fund, I do want to make the point that this 20 basis point difference, which can only be attributable to the fact that one is a captive entity and one isn't, actually understates the fee difference. Because, to be clear, we're only suing on advisory fees here. We're only suing on the advisory fees provided under the investment advisory agreement. Contractually, those fees are 80 basis points. The PSF agreement is for the same advisory fees, but also for a host of other services, including administrative, regulatory, and compliance. So those fees obviously have value. So when you strip out the fees for those services and just look at what the same advisory services are, it has to be less than 60. You know, it's probably somewhere around 40 basis points compared to the 80 basis points contractually that's being charged to the fund before fee waives. Could you turn to the issue of the amount of investment multiplying by 10 while the percentage remains roughly the same? Sure, Your Honor. If I understand the question. I think that's probably the most troubling aspect. If I understand Your Honor's question, it relates to the economies of scale factor. 600 million to 6 billion over 7 years. Right. So the way economies of scale works is that these fees are linked to the assets under management. It's a percentage, right? A daily average. So the question becomes in 600 million to 6 billion, is it really 10 times more expensive to manage each additional dollar of income that's coming into the fund? And what defendants say is in order to satisfy, in order to plead this element, you need to talk about actual transaction costs. And they talk about a case called Crink's that this court issued. But Crink's was a case after bench trial. It was talking about an evidentiary burden after trial. It wasn't talking about a pleading burden. At the pleading phase, and we cite innumerable cases on this point, the way you establish the economies of scale factor is to show that as AUM ballooned, right, the assets under management ballooned, and the fee ballooned proportional to AUM, the amount of work required to manage the fund did not have a proportional growth. And that's what we've done here. We've shown that while you have AUM ballooning 600 percent, the amount of dedicated personnel remained relatively constant, while the amount of, I believe, holdings in the portfolio only doubled. So the idea being that the amount of work did not keep pace as the size of the fund grew extravagantly. They claim that they increased the number of people working on this. I don't believe they claim that there was an increase. I believe the facts in the complaint were that there was a team of 27 dedicated research personnel, and that the fund originally had two portfolio managers. That increased to three, which was still less than one of the funds that we compared them to, the equity fund, which had a fee that was half the price of what the fund was charged here by the same defendant. But even if there was some growth in personnel, the question is not whether there's some growth. The question is whether the growth is commensurate with the explosion in AUM and the explosion in the fees that are proportional to AUM. And here, the facts satisfy that. And to require actual transaction costs pre-discovery, you know, it's funny, the district court and the defendants, they never say how that would be even possible, because this information is not public. It's never reported anywhere. So, you know, how could you possibly know that? The point is you pleaded through circumstantial evidence. You raise a plausible inference. And that, Your Honor, is what we've done here with respect to the economy as a scale factor. You've reserved three minutes rebuttal. Yes, Your Honor. Thank you, Your Honor. We'll hear you then, sir. Thank you. May it please the Court, Mark Holland for J.P. Morgan Investment Management. I think that when you parse the actual facts alleged in this complaint from the conclusory allegations they seek to draw from those facts, you'll agree with Judge Daniels that the facts do not plausibly show that the fee J.P. Morgan charges is so disproportionately large that it violates Section 36B. The thrust of their complaint is, as the Court recognized, the comparison between the fee that the Corp Plus Fund pays to J.P. Morgan and fees that other funds pay, including two other fees advised by J.P. Morgan. But Section 36B does not require fee parity, as the Supreme Court said in Jones v. Harris, or that the fee be the best deal possible, as this Court said in Krinsk. And I think that Amron, which is the most relevant decision to the motion here, because Amron was also affirming a dismissal of a Section 36B complaint on a 12b6 motion, also recognizes that simply alleging that one fee is higher than another doesn't get you where you need to be on Section 36B. Wouldn't multiplying the amount of assets under investment by ten times result in very low economies of scale that a director should be interested in and would want to negotiate? Well, with regard to economies of scale, Judge Jacobs, in order to show that the advisor is not sharing economies of scale, first the plaintiff has to allege that the costs, per unit costs of some sort, are going down as assets increase. What you're trying to do is state it plausibly, and doesn't it seem plausible to you that if you multiply this by ten times that there are economies of scale? I have two responses to that, Judge Jacobs. First is, in Amron, the Court said that you have to plead facts showing either that the costs of the performing fund transactions or the relationship between such costs and the number of transactions performed. You know, there's no allegation here, but to go to your . . . Wouldn't they have to creep inside your internal workings in order to know that? And you're not going to offer that to them voluntarily because you're not crazy, so you'd have to have discovery. Well, I think the fact that they don't have a fact necessary to allege a Gartenberg factor doesn't mean they get the benefit of that Gartenberg factor. There was no data in Amron to that effect, and the Court said, well, then you just don't have the facts to show that claim. But it does mean that something can be plausible and without, you know, with fewer facts than would be needed if you'd had discovery. But let me go to what you're really concerned about, which is the assets of the fund went up over a ten-year period before the period at issue in this complaint. Remember, Section 36B has a one-year limitations period, and so they're complaining about economies of scale. That still could have been reflected in the period that they recover on. I mean, one year is just how much damages they get for what period of time. That's true, Judge Corman, but let's look at the real facts alleged in this complaint. As the assets went up, J.P. Morgan lowered the fee. It lowered the fee from 100 basis points to 80 basis points in 2015. And to share economies of scale, you want to lower fees? That's a significant lowering. Further, since they lowered the fee in 2015, they continue to waive over $10 million a year in advisory fees. Over 10 percent of the advisory fee that they're entitled to collect under the contract, they waive that. So I don't think the complaint shows that J.P. Morgan is actually realizing economies of scale, but even if you accept that they do, they're certainly sharing those economies both by having lowered the fee and by continuing to waive fees. The only reason is for their lowering of the fee, economies or others. There's no requirement under Section 36B that you have to intend to share economies of scale. No, I know that. The fact is they are sharing economies of scale for whatever reason they lowered the fee, and the fact is it means that they are sharing whatever economies may be realized, and I don't think there's anything in the complaint to show that they are. But if they are, they're certainly sharing them through those fee reductions and through those fee waivers which continue to this day. And is there anything about the profit that they make for a public record that they have access to? In this case, they admit that they have nothing about profitability. In Amron, they had nothing about profitability, and they complained that it wasn't publicly available, and the Court said that doesn't matter. Again, just because you don't have access to a fact doesn't mean you get the benefit of having pled that fact for purposes of 36B. You get the benefit of arguing that the complaint is insufficient. Exactly. Even though you're sitting on relevant evidence. Well, we actually This is not a motion for summary judgment. This is on the pleadings. No, Judge Kerman. Mutual funds are required by statute and SEC regulations to disclose more information than almost any other kind of regulated security. Because there's an inherent conflict of interest. The Board essentially, as I understand it, forms a mutual fund, and they pick themselves as the advisor. That's what makes them captive. Well, to your point on the Board There's no real practical way that this Board is going to ever change, and most of these people serve forever, from what I can tell on the public record, at substantial amounts of money that they get. They do, Judge Kerman, but I think under Section 36B, what the Supreme Court said in Jones, that the Board's process, the Board's decision whether or not to approve a fee, is not necessarily relevant for determining whether or not that fee is excessive. You can't bring a claim simply because, under 36B, simply because you don't think the Board did its job. The Eighth Circuit in Gallus against Ameriprise said that The Board has to do its job in making a determination about the reasonableness of the fee. Yes, but that has nothing to do with whether or not they've stated a plausible claim under 36B. They have to show that the claim, they have to show that the fee is somehow so disproportionately large that it has no reasonable relationship to the services rendered and couldn't fall within the range of arm's length. In terms of falling within the range of arm's length, all they have is the Pacific Life Fund. That's the one data point they have where J.P. Morgan charges 60 basis points to an institutional client and 72 to the Core Plus Fund. That hardly shows a range of arm's length bargaining. And another critical factor in terms of evaluating the relationship between the services and the fee is performance. And in Amron, this Court said that you have to allege underperformance in order for that factor to weigh in favor of plaintiffs. Here, the complaint concedes we have average performance over the shorter term of one, three, and five years. And actually, the same document, plaintiffs quote They say middling. They say middling. It's clearly average. Well, I mean, I'm just, you're quoting the complaint. I'm just saying that they say middling. Yes, I think the complaint in their briefs also used the word average. But the point I want to make is that in the longer term, the same data they point to, which is the shareholder semiannual report, which is at the Joint Appendix, page 338, shows that the long-term performance of this fund over the 10-year period has beat both the S&P 500 and its LIPR comparable funds. And to the LIPR That necessarily doesn't mean that there's any more work involved or justifies a higher fee. The point is not the work involved. That goes to the profitability. The point is that you're getting value for money. The relationship between the services and the fee is such that you are getting average performance over the shorter term You're getting money and still be overcharged. But you're getting above-average performance. And going to the point of the LIPR data, the plaintiffs use that LIPR data to criticize the fund's performance. But then when you turn around and look at the comparison to other fees, you see they don't want to use that LIPR data because it's inconvenient to them. But they can't have it both ways. They can't use the LIPR data for performance and then not use it for a comparison to other fees. And what really happened here is when they filed this complaint, they misread the way LIPR presents its data. They thought that if you were in the top 20 percent, you were in the worst 20 percent. But in fact, if you're in the top 20 percent, you're in the best 20 percent. What that means is I'm sorry, but is that measuring the services provided and the nature of the fund? Or is that measuring the performance? No. It's measuring the LIPR data actually measures both. It takes a universe of comparable funds and it looks at what the fees charged by those comparable funds are. And there, this fund pays less than 80 percent of the comparable funds. And then it looks also at the performance of those comparable funds. And you see that our performance was average over the one, three and five-year periods. And as I mentioned, above average for longer periods. So you are getting value for money here, both in terms of performance and in terms of comparable fees. And they reached out for this arm's length bargaining point, what we charge a sub-advisor, but that's just one data point. It doesn't show the range of arm's length bargaining. It just shows, okay, one fund has a slightly better fee. Under Krinsk and under Jones One fund that was not a captive. Yes. Well, that's significant. Well, it's significant, but it only shows 60 basis points for the institutional client fund versus 72 basis points for the core plus fund. That's a lot of money. Well, but I should point out, Judge Corman, that the shareholders in the Pacific Select Fund can't actually pay 60 basis points. They have to pay the Pacific Life Advisor 98 basis points, which is significantly higher than what the shareholders in the core plus fund pay. So, yes, you can look at that institutional charge, but I think you also have to look at the actual fee charge. Is there a comparator fund that does short sales as well as long? You know, Judge, the only fund in the complaint I could find on that is in their Bloomberg fund, so they have something like 297. There is one fund, the PIMCO Fundamental Return Fund. But I don't see that highlighted anywhere. It's not highlighted anywhere. It's in their Exhibit C2 to their complaint. It's about the fifth or sixth fund down. That fund pays 79 basis points. Our fund pays 72 basis points, so we are lower than the only long short fund in their Bloomberg list. Can I ask you a little bit more about the board of trustees? Sure. How long do they serve? Who picks them? They are now self-selected. Judge Corman, years ago, you're right, the chairman of the advisor would pick his golf buddies to be on the board, but that was a long time ago. The SEC has changed the way that's selected, and now the A lot of these board members have been around forever. How do they get fired? J.P. Morgan has a mandatory retirement system, and people do have to rotate off after they reach a certain age. It's a form of life tenure subject to an age, and for which they get paid hundreds of thousands of dollars a year. They do judge, and they do a lot of work for that, but I think this court in the Scalise Against Fund Asset Management case said, you know, criticisms of a board because it earns a lot of fees and it covers a lot of different funds fail to state a claim for any kind of breach of fiduciary duty. That's the way the mutual fund industry works, and simply because you have a board that may sit for a long time and may get a lot of money doesn't show that the fee is excessive. That's the point, I think, that Jones and Gallis were making. It doesn't show that the fee is excessive by itself, but it shows, that's why we have section 36 to begin with. That's exactly right, Judge, and the Supreme Court said in Jones Against Harris that they are two different checks on the fees. One is the board process, and one is the amount of the fee and whether or not it's excessive. You can throw everything out about the board, you're still not going to get a claim under 36B unless you complete facts to show that the fee is excessive, and they don't have those facts here. We have good performance, we have lower than average fees by any apt comparison. They don't have access to all the facts, and we're dealing with a motion to dismiss, and the question is whether there's some plausibility to their claim. That's right, Judge, but in Amron, the same situation prevailed. They didn't have access to certain facts, and Amron said, that doesn't mean you get a buy on that. You have to either plead the facts, or you . . . You wouldn't get a buy, I agree, you wouldn't get a buy in terms of your ultimate . . . ultimately in discovery, they would get that information. But in Amron, it was a rule 12B6 motion to dismiss. They didn't even get beyond that, and I would submit respectfully that this complaint is weaker than the complaint in Amron, and that since Amron, the Supreme Court has tightened the pleading standards to Iqbal and Twombly, so you've got a weaker complaint on a 12B6 motion. It can't possibly meet the plausibility of stating a fee so disproportionately large it violates 36B. Thank you. Thank you. Mr. McNeil. Thank you, Your Honor. Since there was so much discussion about Amron, I would implore the Court to please read the decision, because I think it's quite telling as to why this motion is weaker. In Amron, the Court went to Paines to note that the plaintiff pled no facts whatsoever regarding all of the factors with one sole exception, performance. That was it. It just showed that there were some other funds that performed better, and what the Court said was, you know, that performance alone is insufficient. It was just stating the obvious, which is no one Gartenberg factor will make or break a case. That's it. But if you go back and read the decision, it said there were no facts, for example, with respect to economies of scale, no facts with respect to the costs or the relationship between the services and costs. Well, as I recounted in my opening, we plead plenty of facts about the relationship between the services and the costs. We talk about how AUM grew, right, and it far outstripped the amount of growth in personnel or the amount of holdings in the portfolio. So the plausible inference is that you're having an explosion in fees while the amount of work necessary to invest and advise each additional dollar is not proportionate. And that's all Amron was talking about. Every single factor we have stated plausibly based on specific facts, the specific Gartenberg factors, unlike Amron. Now, one point I also want to make about this idea of pleading a range of fees. There is no such requirement. That is the ultimate burden. That is the sort of umbrella burden, you know, whether or not these fees are outside the range of what arm's-length bargaining would create or yield. But the point is you never even go there, even at trial, because it's a fool's errand that we say as our briefing. The Supreme Court has said that this is a particular industry where the structural conflicts show that forces of arm's-length bargaining don't work like they do in the rest of the marketplace. So who can you pick to? Who can you show and say that is an arm's-length deal when they're all other mutual funds? The way you would show is if it was so far an outlier that it was implausible that arm's-length negotiation would result in that. And that seems to be your pleading burden. Exactly, Your Honor. But it's how do you do that? You do that via the Gartenberg factors. The Gartenberg factors, it was a recognition of the difficulty of showing what a true arm's-length bargain would yield given the state of the market and said here is factors that serve as a proxy for showing what a competitive price would be. And that's exactly what we allege here. You don't have to show a range. You have to satisfy, plausibly allege the Gartenberg factors. And that's what we've done here. With respect to the issue of short sales, I'll just note that the PSF subadvice fund engages in the same long-short strategy. But with the few seconds I have left, I also want to note that's a distinction without a difference. This short strategy, it's nothing exotic. It's something that is done quite commonly. But it's more dangerous and requires you to stay on top of it almost hour to hour. That is not in the record, Your Honor. I'm glad you brought that up because defense counsel admitted below that they were not claiming to Judge Daniels under his questioning, they were not relying on increased risk associated with short sales in seeking dismissal. And then when pressed as to whether or not it requires more work, they admitted there was absolutely nothing in the record that managing the fund because of its short sales required more work. And in fact, the complaint notes that the equity fund, which pays half the fees of the fund, has more investment managers than the subject fund. So if anything, the facts of the case show that it's more work for a fund that costs half as much. There is no evidence in the record whatsoever at this stage that the inclusion is of meaningful difference. You're sort of assuming that investment advice is a commodity rather than something that varies in quality and effort and represents choices that people make when they invest in this fund instead of the other five hundred funds. Your Honor, respectfully, I'm not assuming anything. What I'm saying is that if defendants are going to proffer this short sale, right, this short strategy, which is only a partial strategy as a basis for holding the other competitors inept, the rhetorical question is, well, so what? Why does it matter? Well, they claim it would matter because, well, there's more risk and it requires more work. But they admit that there are no facts in the record to that point. So you can't just say it's an ipsedixit by definition then, right? You have to be able to show that this is a difference that actually amounts to a hill of beans, and they haven't. In fact, we've shown that the only difference is that the equity fund, again, which pays half, 40 basis points, has four dedicated investment portfolio managers, while the fund which contractually pays 80 basis points has three. So to the extent that we're looking at the factual record here, the factual record is that this short strategy, again, which is only partial, only covers 30 percent of the assets under management for the fund and is not exotic in the slightest, doesn't entail any appreciable amount of work, and it doesn't come close to justifying this massive fee differential between the equity fund and the fund. Thank you. Thank you. Expertly argued, I must say. Next, we'll reserve decision.